IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Judge John L. Kane

Civil Action No. **09-cv-01241-JLK**

**COMPLIANCE MARKETING, INC.;**
**COMPLIANCE SERVICES OF EAST TEXAS;**
**CONNIE D. HAGEN, INC. D/B/A DATCS:  DRUG & ALCOHOL TESTING**
**COMPLIANCE SERVICES;**
**DRUG TESTING, INC.;**
**FLEETSCREEN, LTD.;**
**KRISTINA CONSULTING GROUP, LLC;**
**PANHANDLE EMPLOYERS SERVICES, INC;**
**KIM JENON BALDWIN D/B/A ALLIANCE DRUG & ALCOHOL TESTING; AND**
**PROFESSIONAL COMPLIANCE & TESTING, LLC**,

        Plaintiffs,

v.

**DRUGTEST, INC. D/B/A DISA INC.;**
**DRUGTEST, INC. D/B/A DRUG INTERVENTION SERVICES OF AMERICA, INC.;**
**CHS, INC.;**
**CONOCOPHILIIPS COMPANY;**
**MARATHON PETROLEUM COMPANY LLC;**
**MARATHON OIL COMPANY;**
**EQUILON ENTERPRISES LLC D/B/A SHELL OIL PRODUCTS US;**
**SUNOCO, INC.;**
**TESORO COMPANIES, INC.;**
**VALERO ENERGY CORPORATION;**
**APACHE CORPORATION;**
**ENCANA OIL & GAS (USA) INC.;**
**ENCANA CORPORATION; AND**
**SHELL EXPLORATION & PRODUCTION COMPANY**,

        Defendants.

_____

MEMORANDUM OPINION AND ORDER

_____

1

**Kane, J.**

Plaintiffs are a purported class of companies engaged in the business of developing, administering, and implementing drug and alcohol screening services and programs for corporate employers (referred to as "TPA Services"). They bring suit, seeking injunctive relief and treble damages for Defendants' alleged violations of §§ 1 and 2 of the Sherman Act, § 3 of the Clayton Act, 15 U.S.C. § 14, as well as a variety of state laws. This case is currently before me on Defendants' Motions to Dismiss (Docs. 104 and 133).[1] For the reasons stated below, pursuant to Fed. R. Civ. P. 12(b)(6), Plaintiffs' Second Amended Class Action Complaint and Jury Demand, Doc. 130 ("Second Amended Complaint") is dismissed without prejudice for failure to state a claim upon which relief can be granted.

## JURISDICTION AND VENUE

Plaintiffs have filed claims under §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, alleging Defendants' violation of both §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, as well as § 3 of the Clayton Act. Plaintiffs also allege a variety of state law claims. I have jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 (Federal Question) and 1337 (Antitrust Jurisdiction); 15 U.S.C. § 4 (providing U.S. District Courts with jurisdiction over Sherman Act violations); and 15 U.S.C. §§ 15 and 26 (which both provide for a private cause of action in the U.S. District Courts for violations of the antitrust laws). As the state law claims "form part of the same case or controversy" as the federal claims, supplemental jurisdiction over them is proper pursuant to 28 U.S.C. § 1367.

---

[1] Though these motions vary to a certain degree, most of the discussion overlaps. Where necessary, I will discuss the motions separately.

As all Defendants transact business in and are found within this district, one or more Plaintiffs have a principal place of business within this district, and a substantial portion of the events giving rise to this complaint occurred within this district, venue in the District of Colorado is proper pursuant to 15 U.S.C. §§ 15 and 22, as well as 28 U.S.C. § 1391(b) and (c).

**FACTS[2]**

Defendants CHS, Inc.; ConocoPhillips Company; Marathon Petroleum Company LLC; Marathon Oil Company; Equilon Enterprises LLC d/b/a Shell Oil Products US; Tesoro Companies, Inc.; Valero Energy Corporation; Apache Corporation; EnCana Oil & Gas (USA) Inc.; EnCana Corporation; and Shell Exploration & Production Company[3] (collectively "Operator Defendants") are large national or international energy companies that own and/or operate oil and gas exploration, development, production, and refining facilities. To meet their needs for a specialized workforce in a highly cyclical industry, Operator Defendants often retain subcontractors, called "Service Companies," to provide specialized services and equipment at their various job sites and facilities. The individuals indirectly employed by Operator Defendants through the Service Companies are required to work around heavy machinery, with potentially dangerous chemicals, and at facilities where there is a risk of fire or explosion. Given the safety-sensitive nature of this work environment, employees who are under the influence of

---

[2] For purposes of considering a motion to dismiss, "[a]ll well-pleaded facts, as distinguished from conclusory allegations, must be taken as true." *Ruiz v. McDonnell*, 299 F.3d 1173, 1181 (10th Cir. 2002) (quoting *Swanson v. Bixler*, 750 F.2d 810, 813 (10th Cir. 1984)). Accordingly, these facts are drawn exclusively from Plaintiffs' Second Amended Complaint, Doc. 130.

[3] Plaintiffs have voluntarily dismissed Defendants Sunoco, Inc., Doc. 144; B.P. America, Inc.; and Stone Energy Corporation, Doc. 158.

drugs and/or alcohol pose an undue risk not only to their own safety, but also to the safety of others.[4][5]

Thus, as a condition of working on Operator Defendants' job sites, Operator Defendants require Service Companies performing work for them to implement and enforce substance abuse testing programs provided by drug screening companies. Compliance Marketing, Inc.; Compliance Services of East Texas; Connie D. Hagen, Inc. d/b/a DATCS: Drug & Alcohol Testing Compliance Services; Drug Testing, Inc.; Fleetscreen, LTD; Kristina Consulting Group, LLC; Panhandle Employers Services, Inc.; Kim Jenon Baldwin d/b/a Alliance Drug & Alcohol Testing; and Professional Compliance & Testing, LLC (collectively "Plaintiffs") and Defendants Drugtest, Inc. d/b/a DISA, Inc. and Drugtest Inc., d/b/a Drug Intervention Services of America, Inc. (collectively "DISA") are among hundreds of drug screening companies (referred to as "TPAs") competing to provide TPA Services to Service Companies in the Energy Industry.[6]

In the past, many TPAs, including Plaintiffs and DISA, competed to provide TPA

---

[4] As Operator Defendants note in their Reply Memorandum in Support of their Motion to Dismiss, Doc. 146, the magnitude of these risks is illustrated by "the enormous environmental damage and huge liability to the operator that resulted from alcohol abuse on the Exxon Valdez tanker . . .." *Id.* at 3.

[5] In light of these safety concerns and in part because of the de-centralized nature of its workforce, one or more of the Operator Defendants (including, but not limited to, EnCana Oil & Gas, Marathon Oil Company, Shell, and others) have in the past supported and collaborated in efforts to "define the standard [for] health, safety, & environmental orientation for US upstream oil and gas industry." Plaintiffs' Second Amended Complaint, Doc. 130, p. 13 (quoting the SafeLandUSA website). Through these efforts, participating Operator Defendants sought to secure "reciprocal agreements" regarding acceptance of training certification and "access to orientation records through a common database." *Id.*.

[6] TPA Services are a discrete type of service; no other services can be reasonably interchanged or substituted for the testing of employees or potential employees for their use of alcohol or drugs.

Services to Service Companies in the Energy Industry based on price, convenience, quality, and service. By 2005, however, DISA had secured an advantage over its competitors through the establishment of the DISA Contractors Consortium ("DCC"). Through this consortium, DISA catalogs drug and alcohol test results for Energy Industry workers in a proprietary database (the "DCC Database"). Within the Energy Industry, the DCC Database is the only industry-wide database of individuals who have tested positive for drug or alcohol use in the past, or whose profiles have not been updated with recent results. Thus, it is a valuable tool for Operators wishing to preclude workers with unacceptable test histories from working on their job sites as employees of Service Companies.[7] [8]

Given the mobility of workers within the Energy Industry and each Operator's use of numerous Service Companies, however, the usefulness of the DCC database is dependent upon the participation of a significant number of Operators. Accordingly, DISA entered into a series of agreements with Operator Defendants, under the terms of which Operator Defendants require their Service Companies to use the DCC database to screen potential employees.[9] [10] As a result, before a Service Company's employee may come on to an Operator's job site, the Service

---

[7] The DCC database currently contains information on more than 1 million individuals and includes participation of more than thirty-eight hundred companies.

[8] This is similar to the "LA Clean Card" program created by DISA and several of Operator Defendants in the 1990s. Though Plaintiffs note the similarity, they do not specify which Operator Defendants participated in this program.

[9] Some of the Operator Defendants, however, do not themselves use DISA or the DCC database in administering drug and alcohol screening for their own employees, independent contractors, or consultants.

[10] As will be discussed *infra* at p. 14, n. 20, Plaintiffs have only offered proof that some of the Operator Defendants entered into agreements with DISA.

Company must pay DISA a fee to search and retrieve the employee's drug and alcohol test result history from the DCC Database.

DISA has refused to populate the DCC Database with the drug-testing information collected by other TPAs, despite the fact that all providers use licensed and regulated collectors, breath alcohol technicians, medical record officers, and labs in conformance with state and federal testing guidelines.[11] Furthermore, DISA will not allow a company to use the DCC database unless it also uses DISA for TPA Services, and it has raised the prices of its drug and alcohol screening and program administration services as a condition to using the DCC Database.[12][13] Thus, in order to meet the requirements of Operator Defendants and gain access to the DCC database, Service Companies must also hire DISA as their TPA Service provider despite the fact that DISA charges higher prices for its TPA Services and fails to provide the full range of services supplied by competitors.[14]

Operator Defendants require use of the DCC Database knowing that DISA will not allow a Service Company to use the DCC Database without using DISA for TPA Services. As a result, Plaintiffs have been precluded from providing TPA Services to the Service Companies supplying services and equipment to Operator Defendants and DISA has acquired more than 75% of the

_____

[11] The fungibility of these services is demonstrated by the fact that DISA has sub-contracted sample collection and testing back to some of the very TPAs who lost their Service Company clients to DISA after the implementation of the DCC Database.

[12] Like Plaintiffs, DISA also provides its TPA Services on a stand-alone basis for its customers.

[13] The Service Companies pay all expenses associated with DISA's TPA Services and the DCC database. The Operators do not directly pay any of the costs of these services.

[14] For instance, unlike many of the Plaintiffs, DISA does not offer on-site sample collection and testing as part of its TPA Services.

market share for the provision of TPA Services to Service Companies in the Energy Industry.[15]

## LEGAL STANDARD

Under Fed. R. Civ. P. 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The Complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*, 355 U.S. at 45-46.

As the Supreme Court recently clarified, however, "*Conley* . . . described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Twombly.*, 550 U.S. at 563 (emphasis added). Accordingly, as the court explained in *Twombly* and reiterated in *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009), "to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). Significantly, though a court will accept as true all well-pleaded facts alleged for purposes of determining plausibility, it will not consider "[t]hreadbare recitals of elements of a cause of action, supported by mere conclusory statements . . .." *Iqbal*, 129 S. Ct. at 1950.

Plausibility does not require "detailed factual allegations," but it does require that a

---

[15] By means of illustration, Service Company representatives attending a meeting of the Association of Energy Service Companies repeatedly informed representatives of TPA Service providers that their Service Companies could not send TPA work to those providers because they had to use DISA.

7

complaint have sufficient factual assertions "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.[16] As this Circuit has held, "the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis in original).

## DISCUSSION

Plaintiffs' federal claims are based primarily on alleged violations of the Sherman Act. 15 U.S.C. § 1 *et seq.*.[17] The Sherman Act, signed into law in 1890, "was enacted in the era of 'trusts' and of 'combinations' of businesses and of capital organized and directed to control of the market by suppression of competition in the marketing of goods and services, the monopolistic tendency of which had become a matter of public concern." *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 492-93 (1940). The Act, therefore, focuses not on "the vindication of general 'notions of fair dealing,'" but on "the protection of competition or prevention of monopoly. . .." *Four Corners Nephrology Assoc. v. Mercy Med. Ctr. of Durango*, 582 F.3d 1216, 1225 (10th Cir. 2009); *see also Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993) ("The purpose of the Sherman Act is not to protect businesses from the working of the

---

[16] Significantly, in formulating this standard the *Twombly* court was particularly aware of and concerned with the unusually high cost of discovery in antitrust cases, such as the case at hand. *See* 550 U.S. at 559 (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)) ("Probably, then, it is only by taking care to require allegations that reach the level suggesting conspiracy that we can hope to avoid the potentially enormous expense of discovery in cases with 'no reasonably founded hope that the [discovery] process will reveal relevant evidence' to support a § 1 claim").

[17] As will be briefly discussed *infra* at p. 34, Plaintiffs also allege violations of § 3 of the Clayton Act.

market; it is to protect the public from the failure of the market").

The Act is organized into two sections. Section 1 specifically prohibits "contract[s], combination[s] . . ., or conspirac[ies] in restraint of trade or commerce among the several states . . .," 15 U.S.C. § 1; it does not, however, apply to unilateral conduct, regardless of its impact on trade or commerce. *See Abraham v. Intermountain Healthcare, Inc*, 461 F.3d 1249, 1256 (10th Cir. 2006). Section 2 applies to "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any person or persons, to monopolize any part of trade or commerce . . .." 15 U.S.C. § 2. "The possession of monopoly power will not be found unlawful," however, "unless it is accompanied by an element of anticompetitive conduct." *Verizon Commc'ns. Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).

*First Claim for Relief:  Section 1 of the Sherman Act*

Section 1 of the Sherman Act specifically prohibits "contract[s], combination[s] . . ., or conspirac[ies] in restraint of trade or commerce among the several states . . .." 15 U.S.C. § 1. As a threshold matter, Plaintiffs must first establish their standing to bring an antitrust claim in order to assert a violation of § 1.

*A.  Antitrust Standing*

In order to establish Article III standing, Plaintiffs must allege that (1) they have suffered or imminently will suffer an injury; (2) the injury is fairly traceable to the conduct of the defendant; and (3) a favorable federal court decision is likely to redress the injury. *See Wilderness Soc'y v. Kane County*, 581 F.3d 1198, 1209 (10th Cir. 2009) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Antitrust standing, however, requires a heightened inquiry. Though "[h]arm to the antitrust plaintiff is sufficient to satisfy the

constitutional standing requirement of injury in fact, . . . the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." *Tal v. Hogan*, 453 F.3d 1244, 1253 (10th Cir. 2006). Thus, Plaintiffs must show (1) an antitrust injury and (2) a causal connection between the defendant's antitrust violation and their alleged antitrust injury. *See id.* An antitrust injury is "an injury of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful." *Abraham*, 461 F.3d at 1267.

Here, Plaintiffs allege that DISA and Operator Defendants have entered into agreements which have restrained competition for the provision of TPA Services to the Energy Industry. They further allege that they "have been injured in their business property as a result of these illegal contracts, combinations, agreements and conduct . . .." Plaintiffs' Second Amended Complaint, Doc. 130, p. 29. If proven, these allegations are sufficient basis for Plaintiffs' antitrust standing. They allege an injury, restraint of competition, which the Sherman Act is specifically designed to prevent, and that the injury flows from concerted action by the Defendants.

### B. Concerted Action

In order to establish a violation of § 1, a party must show the existence of "a contract, combination, or conspiracy [('concerted action)] that unreasonably restrains trade in the relevant market." *Full Draw Prods. v. Easton Sports, Inc.*, 182 F.3d 745, 756 (10th Cir. 1999) (quoting *TV Commc'ns Network, Inc. v. Turner Network Television*, 964 F.2d 1022, 1027 (10th Cir. 1992)). Concerted action involves "two or more entities that previously pursued their own interests separately . . . combining to act as one for their common benefit." *Abraham*, 461 F.3d

at 1256 (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984)).

"When two formerly separate entities combine for their common benefit, their activity is 'fraught with anti-competitive risk' because it 'deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands.'" *Id.* (quoting *Copperweld*, 467 U.S. at 768-69).

Concerted action may be shown either by direct or circumstantial evidence. Direct evidence is evidence "that is explicit and requires no inferences to establish the proposition or conclusion being asserted . . .." *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1083 (10th Cir. 2006)(quoting *In re Baby Food Antitrust Litg.*, 166 F.3d 112, 118 (3rd Cir. 1999)). Circumstantial evidence is, by contrast, evidence that requires some inference on the part of the fact-finder. Antitrust law, however, "limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Abraham*, 461 F.3d at 1257 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)). "Conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.*

### C. Unreasonable Restraint on Trade

A party seeking to establish a violation of § 1 must also show that the alleged concerted action imposes an unreasonable restraint on trade. *Full Draw Prods.,* 182 F.3d at 756; *see also Law v. NCAA*, 134 F.3d 1010, 1016 (10th Cir. 1998) ("Because nearly every contract that binds the parties to an agreed course of conduct 'is a restraint of trade' of some sort, the Supreme Court has limited the restrictions contained in section 1 to bar only 'unreasonable restraints of trade'"). Generally, courts evaluate the reasonableness of a restraint on trade based on a "rule-

of-reason" analysis. Under the rule of reason analysis, the fact-finder is required to "weigh all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Gregory v. Fort Bridger Rendezvous Ass'n*, 448 F.3d 1195, 1203 (10th Cir. 2006) (quoting *Diaz v. Farley*, 215 F.3d 1175, 1182 (10th Cir. 2000)). As the 10th Circuit explained in *Law v. NCAA*:

> Courts have imposed a consistent structure on rule of reason analysis by casting it in terms of shifting burdens of proof. Under this approach, the plaintiff bears the initial burden of showing that an agreement had a substantially adverse effect on competition. If the plaintiff meets this burden, the burden shifts to the defendant to come forward with evidence of the procompetitive virtues of the alleged wrongful conduct. If the defendant is able to demonstrate procompetitive effects, the plaintiff then must prove that the challenged conduct is not reasonably necessary to achieve the legitimate objectives or that those objectives can be achieved in a substantially less restrictive manner. Ultimately, if these steps are met, the harms and benefits must be weighed against each other in order to judge whether the challenged behavior is, on balance, reasonable.

134 F.3d at 1019 (citations omitted). Significantly, "rule of reason" analysis requires a court to "analyze the relevant market power of the defendants and therefore requires the plaintiff to allege a valid market." *Campfield v. State Farm Mut. Auto Ins. Co.*, 532 F.3d 1111, 1119 (10th Cir. 2008). In most cases, this analysis is an intensive, time-consuming inquiry.

In recognition of the burden the rule of reason analysis places on the fact-finder, courts have applied a *per se* illegality standard where "the challenged action falls into the category of 'agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.'" *Nw. Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 289 (1985). Once conduct is deemed *per se* unreasonable, "a court need not examine the practice's impact on

the market or the procompetitive justifications for the practice advanced by a defendant before finding a violation of antitrust law." *Law*, 134 F.3d at 1016. Most relevant for purposes of this case, courts have found that, in some situations, tying and group boycotts are *per se* violations of the Sherman Act.

Here, Plaintiffs explicitly allege that DISA has engaged in two types of anticompetitive conduct constituting unreasonable restraint of trade in violation of § 1: exclusive dealing with Operator Defendants to the exclusion of Plaintiffs and "tying" the DCC Database to DISA's TPA Services. Further, Plaintiffs implicitly allege Operator Defendants have engaged in an illegal group boycott which unreasonably restrains trade in violation of § 1.[18] I will begin by analyzing Plaintiffs' exclusive dealing claim before turning my attention to the tying and group boycott claims.

### D. Plaintiffs' § 1 Arguments

#### 1. Exclusive Dealing

Plaintiffs allege agreements exist between DISA and Operator Defendants requiring "Service Companies who wish to perform services for the Operators . . . to retain DISA to input and store records of their employees' drug and alcohol tests in the DCC Database."[19] *Second Amended Complaint*, Doc. 130, p. 7. As a threshold matter, Plaintiffs' generalized allegations of

---

[18] As Operator Defendants note in their Reply Memorandum in Support of Their Motion to Dismiss, Doc. 146, the Plaintiffs do not even use the word "boycott" in their Second Amended Complaint. *Id.* at 9. I will, nevertheless, analyze whether Plaintiffs have adequately pled an unlawful group boycott for purposes of these Motions to Dismiss. *See generally*, F. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice").

[19] In their Response to Drugtest, Inc.'s Motion to Dismiss, Doc. 142, Plaintiffs claim that they have also sufficiently alleged a horizontal agreement among Operator Defendants which constitutes a *per se* unlawful group boycott. *Id.* at 14. That claim is analyzed in the context of my analysis of the group boycott claim, *infra* at pp. 23-27.

agreements between Operator Defendants and DISA do not provide sufficient factual basis to demonstrate concerted action between each Operator Defendant and DISA. Plaintiffs do, however, offer evidence that (1) EnCana, Conoco, SEPCO, Marathon, and Apache required their Service Companies to enroll in the DCC Database; (2) these Operator Defendants used similar language in notifying their Service Companies of this requirement; and (3) DISA directly contacted the Service Companies working with these Operator Defendants to remind them of the requirement. *Id.* at 17-20.[20] This circumstantial evidence is sufficient to establish concerted action between DISA and, <u>individually</u>, EnCana, Conoco, SEPCO, Marathon, and Apache. As Plaintiffs do not adequately allege concerted action between DISA and CHS, Equilon, Tesoro, or Valero, however, any claim of exclusive dealing between DISA and these parties must be dismissed. Even accepting these pleadings as adequate, however, Plaintiffs have failed to establish the plausibility of their claim that the alleged arrangements constitute unlawful exclusive dealing.

Arrangements between parties at different levels of the distribution chain are referred to as "vertical agreements." *See Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988). A vertical agreement in which firms agree that they will deal only with each other (or not deal with each others' competitors) is considered an "exclusive dealing arrangement." *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 473 n.2 (3rd Cir. 1992). Exclusive dealing arrangements, like other non-price vertical restraints, are generally considered procompetitive and are judged under the rule of reason. *See Business Elecs. Corp.*, 485 U.S. at 724; *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 44-45. In order to establish that an

---

[20]  With respect to the other four Operator Defendants (CHS, Equilon, Tesoro, and Valero), there are no specific allegations whatsoever.

exclusive dealing arrangement is an unreasonable restraint on trade in violation of § 1, the

Plaintiffs must plead a relevant market and that the agreement substantially forecloses their

ability to compete in the relevant market. *C.f.*, *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S.

320, 327 (discussing exclusive dealing in the context of a Clayton Act § 3 violation).  Here,

Plaintiffs have failed on both counts.

*a. Relevant Market*

The Plaintiffs bear the burden of defining the relevant market.  *Queen City Pizza, Inc. v.

Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3rd Cir. 1997).  In defining the relevant market,

Plaintiffs must allege both a relevant product market and a relevant geographic market.  *Id.* at

435.  "The geographic market is 'the narrowest market which is wide enough so that products

from adjacent areas . . . cannot compete on substantial parity with those included in the market.'"

*Westman Comm'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216, 1222 (10th Cir. 1986).  The parties

do not contest, nor do I find lacking, Plaintiffs' definition of the relevant geographic market as

the United States.[21]  Accordingly, my analysis focuses on the Plaintiffs' definition of the relevant

product market.

The Plaintiffs must specifically define the product market by reference to the "reasonable

interchangeability of use or the cross-elasticity of demand between the product [in question] and

substitutes for it."  *Brown Shoe Co., Inc. v. United States*, 370 U.S. 294, 325 (1962); *see also

Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1131 (10th Cir. 2002).

"Interchangeability implies that one product is roughly equivalent to another for the use to which

it is put; while there may be some degree of preference for the one over the other, either would

---

[21]  Though Plaintiffs make passing reference to geographic sub-markets in the Rocky
Mountain and Gulf Coast regions, they do not offer any evidence in support of those markets.

work effectively." *Queen City Pizza*, 124 F.3d at 437. Factors to be considered include price, use, and qualities. *Id.* "Cross-elasticity of demand is a measure of the substitutability of products from the point of view of buyers. More technically, it measures the responsiveness of the demand for one product to changes in the price of a different product." *Id.* (citing E. Thomas Sullivan and Jeffrey L. Harrision, *Understanding Antitrust and its Economic Implications* 217 (1994)).

Though the Plaintiff is responsible for defining the relevant market, it cannot "artificially create antitrust claims by narrowly defining the relevant market to create the appearance of an antitrust injury." *Smalley & Co. v. Emerson & Cuming, Inc.*, 808 F. Supp. 1503, 1512 (D. Colo. 1992). The relevant market must "reflect[] the total market demand for plaintiffs' product, not just defendants' demand . . .. When there are numerous sources of interchangeable demand, the plaintiff cannot circumscribe the market to a few buyers in an effort to manipulate those buyers' market share." *Campfield*, 532 F.3d at 1119 (emphasis added). "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Id.* at 1118 (quoting *Queen City Pizza, Inc.*, 124 F.3d at 436).

Plaintiffs allege that, for purposes of analyzing its claims, the relevant product market is "the provision of TPA Services to Service Companies in the Energy Industry."[22] Plaintiffs'

---

[22] Plaintiffs also allege "[a]n additional relevant market exists for the services of a database holding the results of the drug and alcohol screenings" – essentially the DCC Database. Plaintiffs' Second Amended Complaint, Doc. 130, p. 14. Even if this was accepted as the relevant market, however, Defendant DISA "does not violate the Sherman Act by virtue of the

Second Amended Complaint, Doc. 130, p. 12.  In support of their definition of the relevant market, Plaintiffs assert that jobs in the Energy Industry are unique, safety in the industry is of paramount importance, drug and alcohol testing is necessary to ensure safety, and Operator Defendants have collaborated in the past to standardize safety training. *Id.* at 12-14.  Plaintiffs also allege that "TPA Services are a discrete type of service." *Id.* at 14.  Though Plaintiffs allege sufficient facts to support a relevant market consisting of the provision of TPA Services generally, Plaintiffs fail to address the interchangeability or cross-elasticity of the provision of TPA Services <u>to Service Companies in the Energy Industry</u>.

Plaintiffs' references to the uniqueness of the Energy Industry and past efforts to coordinate safety training do not support a finding that TPA Services provided to the Energy Industry differ in any material way from TPA Services provided to other industries.  To the contrary, Plaintiffs' arguments suggest that TPA Services provided to the Energy Industry <u>are</u> interchangeable with TPA Services in general.  Plaintiffs' lone reference to "interchangeability" merely reinforces this conclusion.  *See id.* ("No other services reasonably can be interchanged or substituted for the testing of employees or potential employees for their use of alcohol or drugs").  Plaintiffs' failure to plead the relevant market adequately is fatal to their exclusive dealing claim.[23]

---

natural monopoly it holds over its own product." *TV Commc'ns Network, Inc.*, 964 F.2d at 1025. Though in *Eastman Kodak Co. v. Image Technical Servs., Inc.* the Supreme Court found that a single brand of a product or service can, in limited circumstances, constitute the relevant market, that finding was based on the fact that the service at issue was not interchangeable.  504 U.S. 451, 481-82 (1992).  As Plaintiffs have failed to address either the interchangeability or cross-elasticity of demand for a market defined as a DCC-type database, *Eastman Kodak* is inapposite.

[23]  As is discussed *infra*, Plaintiffs' failure to plead the relevant product market adequately is also fatal, under a rule of reason analysis, to its group boycott claim, as well as to its § 2 claims.

### b.  Anticompetitive Effects

In addition to alleging a relevant market, Plaintiffs must show anticompetitive effects resulting from a substantial foreclosure of their ability to compete in the relevant market in order to establish a violation of § 1 in the context of an exclusive dealing arrangement.  *C.f., Tampa Elec. Co.*, 365 U.S. at 327 (discussing exclusive dealing in the context of a Clayton Act § 3 violation).  In light of the above conclusion that Plaintiffs have failed to plead the relevant market adequately, it is impossible for them to prove substantial foreclosure.  Even if this market definition was adequately pled, however, Plaintiffs fail to allege facts which could support a finding of substantial foreclosure.

In order to show substantial foreclosure, Plaintiffs must demonstrate that "the competition foreclosed by the [exclusive dealing arrangements] . . . constitute[s] a substantial share of the relevant market."  *Id.* at 328.  " To determine substantiality in a given case, it is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which preemption of that share of the market might have on effective competition therein."  *Id.* at 329.  Plaintiffs have failed to plead any facts demonstrating the total volume of commerce involved in the provision of TPA services to Service Companies in the Energy Industry as a whole.[24]  In light of this failure, it is impossible to

---

[24]  As Defendant DISA notes in its Memorandum of Law in Support of its Motion to Dismiss the First Amended Class Action Complaint, Doc. 105, Plaintiffs "acknowledge there are other, unnamed companies in the 'Energy Industry' . . .."  *Id.* at 12.  Further, Plaintiffs fail to suggest that "DISA had exclusive agreements with any of the unnamed energy companies, including massive energy companies like ExxonMobil."  *Id.*  Perhaps even more significant, in their Response to Drugtest Inc.'s Motion to Dismiss, Doc. 142, the Plaintiffs make no effort to

determine the extent to which DISA's conduct has foreclosed Plaintiffs' ability to compete. Accordingly, Plaintiffs have not adequately alleged substantial foreclosure.

Given Plaintiffs' failure to allege adequately either the relevant product market or substantial foreclosure of their ability to compete in the relevant market, dismissal of their exclusive dealing claim is appropriate.

### 2. Tying

Plaintiffs also allege that DISA unlawfully ties the sale of its TPA Services to use of its proprietary DCC Database. A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchase a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Eastman Kodak*, 504 U.S. at 461 (quoting *N. Pacific R.. Co. v. United States*, 356 U.S. 1, 5-6 (1958)). "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of the tied product." *Jefferson Parish*, 466 U.S. at 12. Though historically the Supreme Court considered all tying arrangements to be *per se* illegal under § 1 of the Sherman Act, *see Standard Oil Co. v. United States*, 337 U.S. 293, 305 (U.S. 1949) (assuming that "[t]ying arrangements serve hardly any purpose beyond the suppression of competition"), the Court began applying rule of reason analysis in some instances where it acknowledged the theoretical validity of some tying arrangements. *See Jefferson Parish*, 466 U.S. at 12. Recently, the Court confirmed that market factors must be evaluated in analyzing tying claims and pro-competitive benefits may justify tying arrangements. *Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 33-46 (2006). The Court stated

---

demonstrate that they have pled any facts which could support a finding of substantial foreclosure.

unequivocally, "in all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product." *Id.* at 46. As Plaintiffs have failed to plead the relevant market adequately, any attempt to argue that Defendants' conduct constitutes an illegal tying arrangement necessarily fails under a rule of reason analysis.[25] Thus, I will focus my analysis on whether Defendants' conduct constitutes a *per se* illegal tying arrangement.

As a preliminary matter, the Complaint makes no allegations that Operator Defendants have market power in the DCC Database. Defendants in this action include both DISA, a competitor of Plaintiffs in the tied market, and Operator Defendants, direct customers of the tying product and secondary customers of the tied product. While DISA has a clear economic interest as the purveyor of both the tying and the tied product, the economic interest of Operator Defendants is less clear. "[W]here a third party is involved in selling the tied product to the plaintiff, most courts have required that the tying product seller have a direct economic interest in the sale of the tied product before an illegal tying arrangement will be found." *Sports Racing Servs. v. Sports Car Club of Am.*, 131 F.3d 874, 888 (10th Cir. 1997). The Tenth Circuit has held that absent an economic interest, a tying claim cannot succeed. *Abraham*, 461 F.3d at 1266. Though Plaintiffs' Second Amended Complaint alleges that there is no economic detriment to the Operators as the additional cost of the tied services is borne by the Service Companies (Compl. 107, 109), it fails to allege any economic benefit to Operator Defendants. Without an economic interest in the sale of TPA Services, Operator Defendants cannot be liable for tying.

Though DISA has the requisite economic interest in the provision of both the tying and the tied products, Plaintiffs fail to allege all four elements of tying sufficiently. In order to

---

[25] For more discussion of Plaintiffs' failure to plead the relevant market, *see* discussion *supra* at pp. 15-17.

establish the existence of an illegal tying arrangement, Plaintiffs must adequately plead the existence of: "(1) two separate products,[26] (2) a tie – or conditioning of the sale of one product on the purchase of another, (3) sufficient economic power in the tying product market, and (4) a substantial volume of commerce affected in the tied product market." *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'n, Inc.*, 63 F.3d 1540, 1546 (10th Cir. 1995).

### a. Two Separate Products

As a threshold matter, Plaintiffs must adequately plead the existence of two distinct products. The existence of distinct products "turns not on the functional relation between [the products] but rather on the character of the demand for the two items." *Jefferson Parish*, 466 U.S. at 19. In the instant case, the two alleged products are drug testing services and a database containing the results of the drug tests. Though it seems unlikely that there is any demand for an unpopulated database, for purposes of this motion I assume that Plaintiffs could establish that the DCC Database, the tying product, is distinct from the TPA Services, the tied product, and that each constitutes a separate product or service.

### b. The Existence of a "Tie"

It is self-evident that Plaintiffs must allege the existence of a "tie" in order to plead tying adequately. A "tie" exists where a party coerces or conditions the sale of one product on the purchase of another. *Multistate Legal Studies,* 63 F.3d at 1546. I find Plaintiffs' allegations that DISA conditions access to its database on the use of DISA for TPA Services and that DISA charges separate fees for TPA Services and database access adequately establish the existence of

---

[26] In the context of a Sherman Act § 1 claim, the term "products" includes services and is not limited to goods. *See Eastman Kodak Co.*, 504 U.S. at 461-62 (1992).

a tie in this case.

### c. Sufficient Economic Power in the Tying Market

In order to establish their tying claim, Plaintiffs must also show that DISA has market power in the tying product market. *Illinois Tool Works Inc*., 547 U.S. at 36. "The existence of such power ordinarily is inferred from the seller's possession of a predominant share of the market." *Eastman Kodak*, 504 U.S. 464. I find Plaintiffs' allegations that DISA maintains the only industry-wide database and that the DCC program is the largest screening program in existence constitutes sufficient evidence of economic power in the tying product market.

### d. Substantial Volume of Commerce Affected

Finally, Plaintiffs must show that the tying arrangement affects a substantial volume of commerce in the tied product market. *Multistate Legal Studies,* 63 F.3d 1546. The product market may be further developed after discovery, but a legally cognizable product market must be present in the pleadings. *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008). As discussed previously, Plaintiffs fail to adequately allege the existence of a market for the provision of TPA Services to Service Companies in the Energy Industry. Furthermore, Plaintiffs fail to assert facts suggesting that the tying arrangement complained of has a substantial affect on the general market for TPA Services.

In order to survive a motion to dismiss under FRCP 12(b)(6), Plaintiffs must plead factual allegations establishing each element of their tying claim. As Plaintiffs fail to adequately allege that the complained of tying arrangement affects a substantial volume of commerce in the market for the provision of TPA Services, their tying claim must be dismissed.

*3. Group Boycott*

As noted above, group boycotts may be found to be unreasonable restraints of trade in

violation of § 1 under either a rule of reason analysis or a *per se* illegality standard.  *Nw.*

*Wholesale Stationers*, 472 U.S. at 293.  As Plaintiffs have failed to plead the relevant market

adequately, any attempt to argue that Defendants' conduct constitutes an illegal group boycott

necessarily fails under a rule of reason analysis.[27]  Thus, I will focus my analysis on whether

Defendants' conduct constitutes a *per se* illegal group boycott.

In the context of group boycotts, reviewing courts usually find conduct to be *per se*

illegal  where there are "joint efforts by a firm or firms to disadvantage competitors by 'either

directly denying or persuading or coercing suppliers or customers to deny relationships the

competitors need in the competitive struggle.'"  *Id.* at 294.  Such conduct usually takes one of

three forms:

1.  Horizontal agreements among traders to exclude direct competitors;
2.  Vertical combinations that are "widespread" in nature to exclude competitors
of some members of the combination; and
3.  Combinations designed to influence trade practices of boycott victims rather
than to eliminate them as competitors.

*Genetic Sys. Corp. v. Abbott Labs.*, 691 F. Supp. 407, 416 (D.D.C. 1988).  Presumably, Plaintiffs

assert that the group boycott was of the second type – a vertical group boycott – consisting of

Plaintiffs' direct competitor DISA and the indirect purchasers of Plaintiffs' product, Operator

Defendants.  The case law and the facts do not, however, support Plaintiffs' allegations that the

Defendants' conduct constitutes a *per se* illegal group boycott.

To the extent Plaintiffs allege vertical agreements between DISA and Operator

---

[27]  For more discussion of Plaintiffs' failure to plead the relevant market, *see* discussion
*supra* at pp. 15-17.

Defendants, these do not, standing alone, constitute a *per se* illegal group boycott.[28]  In order to establish that a group boycott is *per se* illegal, "there must be an agreement among conspirators whose market positions are <u>horizontal</u> to each other."  *Coffey v. Healthtrust, Inc.*, 955 F.2d 1388 (10th Cir. 1992)(quoting *Westman Comm'n Co.*, 796 F.2d at 1224, n.1 (emphasis added)).  Accordingly, in order to prove the complained of conduct constitutes a *per se* illegal group boycott, Plaintiffs must prove that there exists some agreement among the Operator Defendants.

As a threshold matter, Plaintiffs fail to specifically allege the existence of an agreement among the Operator Defendants to mandate that Service Company workers be cleared through DISA as a condition of working on Operator Defendants' job sites.[29]  As in *Twombly*, Plaintiffs "complaint leaves no doubt that [they] rest their [group boycott] claim on descriptions of parallel conduct and not on any independent allegation of actual agreement among the [Operator Defendants]."  550 U.S. at 564.  And, again, as in *Twombly*, Plaintiffs' Second Amended Complaint fails to "mention[] [a] specific time, place, or person involved in the alleged conspiracies."  *Id.* at 565, n. 10; *see also Robbins*, 519 F.3d at 1248.  At most, the few allegations related to specific Operator Defendants in Plaintiffs' Second Amended Complaint suggest that some (but not all) Operator Defendants required Service Companies to use DISA-cleared workers at various points over a five-year period (starting in 2003 and ending in 2009), which in itself refutes the idea of some overarching agreement to impose such a requirement.

_____

[28]  Nor do they, as discussed *supra* at pp. 13-19, constitute illegal exclusive dealing arrangements.

[29]  Though Plaintiffs make passing reference to agreements between and among DISA and Operator Defendants, they fail to discuss with any particularity any agreement among the Operator Defendants.  Such conclusory assertions of agreements are ignored for purposes of Rule 12(b)(6).  *Twombly*, 550 U.S. at 557.

Instead of direct evidence of a horizontal agreement, Plaintiffs suggest past collaboration by some Operator Defendants on similar initiatives involving employee training and workplace management constitutes a "track record" of cooperation giving rise to an inference of such cooperation in the instant case. Such "track record" allegations, however, do not give rise to an inference of agreement under *Twombly*. *See, e.g.*, *In re Digital Music Antitrust Litig.*, 592 F. Supp. 2d 435, 444 (S.D.N.Y. 2008).

Plaintiffs also seek to establish the existence of a horizontal agreement by providing evidence of conscious parallelism. Standing alone, circumstantial evidence such as conscious parallelism "falls short of 'conclusively establishing agreement or itself constituting a Sherman Act offense.'" *Twombly*, 550 U.S. at 553 (quoting *Theatre Enter., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540-41 (1954)). "[I]f the defendants had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." *Abraham*, 461 F.3d at 1257-58 (quoting *Rossi v. Standard Roofing*, 156 F.3d 452, 466 (3rd Cir. 1998)). A party may, however, support an inference of concerted action by producing evidence that "the parties are acting against their own individual business interests, or that there is motivation to enter into an agreement requiring parallel behavior." *Monument Builders of Greater Kansas City, Inc. v. American Cemetery Ass'n of Kansas*, 891 F.2d 1473, 1481 (10th Cir. 1989).

As evidence of conscious parallelism, Plaintiffs cite statements by representatives of Operator Defendants acknowledging that they have a common workforce and common interests as well as a "striking" similarity between letters sent by Conoco, SEPCO, Marathon, and Apache

notifying their Service Companies of the requirement to use DISA.[30]  Finally, Plaintiffs assert

that "[t]he DCC Database would not accomplish its stated purpose unless as many Service

Companies as possible are compelled to sign up for DISA's database service."  Plaintiffs'

arguments necessarily fail to establish conclusively the existence of a horizontal agreement,

however, as they acknowledge plausible explanations for the conscious parallelism noted by

Plaintiffs – namely that each Operator Defendant would have a powerful incentive to require its

Service Companies to use only workers cleared through the DCC Database whether or not any

Operator Defendants did so.[31]

    Even if Plaintiffs adequately pled the existence of a horizontal agreement between

Operator Defendants, I find it likely that the procompetitive effects of those agreements

outweighs any potential repugnance.  Plaintiffs' Second Amended Complaint cites many reasons

why the supposed agreement to require Service Companies to use only DISA-cleared workers

would benefit occupational health and safety and, thus, be procompetitive.  *See, e.g.*, *Diaz,* 215

F.3d at 1183-84 (rejecting *per se* analysis to group boycott in question and holding that

"*Northwest Wholesale* explicitly allows courts to consider plausible arguments concerning

procompetitive effects in determining whether the *per se* rule or the rule of reason should apply

to a horizontal group boycott").

    As Plaintiffs fail to plead an adequate relevant market or adequately allege the existence

---

[30]  Plaintiffs specifically cite correspondence from EnCana (requiring compliance by March 2004) , ConocoPhillips (requiring compliance by January 1, 2008), SEPCO (requiring compliance by August 4, 2008), Marathon (requiring compliance by September 29, 2008), and Apache (requiring compliance by May 1, 2009).  Each of these letters was followed by correspondence from DISA reiterating the requirement to enroll in the DCC program.  Plaintiffs also generally allege similar correspondence from the other Operator Defendants.

[31]  See discussion *supra*, pp. 3-6.

of a horizontal agreement between the Operator Defendants, their group boycott claim must be dismissed.

*Second and Third Claims for Relief: Section 2 of the Sherman Act*

Section 2 of the Sherman Act applies to "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any person or persons, to monopolize any part of trade or commerce . . .." 15 U.S.C. § 2. Plaintiffs allege that Defendants have monopolized, attempted to monopolize, or in the alternative conspired to monopolize the provision of TPA Services to the Energy Industry.[32] As noted above, Plaintiffs must first establish their antitrust standing to bring claims under § 2 of the Sherman Act.

*A. Antitrust Standing*

As noted above, to establish antitrust standing Plaintiffs must show (1) an antitrust injury and (2) a causal connection between Defendant's antitrust violation and its alleged antitrust injury. Here, Plaintiffs allege that DISA and Operator Defendants have engaged in conduct which has resulted in the monopolization of the market for the provision of TPA Services to the Energy Industry; that DISA and Operator Defendants have attempted to monopolize the market for the provision of TPA Services to the Energy Industry; or, in the alternative, that DISA and Operator Defendants have conspired to monopolize the market for the provision of TPA Services to the Energy Industry. They further allege that they have been injured as a result of DISA's and Operator Defendant's actions. If proven, these allegations provide sufficient basis for Plaintiffs' antitrust standing in relation to their monopolization and attempted monopolization claims

---

[32] Plaintiffs' Second Amended Complaint does not explicitly include a claim of conspiracy to monopolize. As with the group boycott claim, however, I undertake analysis of this claim in the interest of judicial efficiency and in an abundance of caution.

against DISA and their conspiracy claim against DISA and Operator Defendants.  They fail, however, to establish standing for their monopolization and attempted monopolization claims against Operator Defendants.

As a matter of law, a party cannot monopolize or attempt to monopolize a market in which it is not a supplier.  *See, e.g., Pastore v. Bell Tel. Co.*, 24 F.3d 508, 513 (3rd Cir. 1994) (Dismissing a claim of attempted monopolization as "[w]ithout any share in the relevant market *as described by plaintiffs,* there can be no inference that defendants hold sufficient economic power in that market to create a dangerous probability of monopoly" (emphasis in original)); *Genetic Sys. Corp.*, 691 F. Supp.at 421 (dismissing § 2 claims because the plaintiff was "[u]nable to allege or show that the [defendant] had a specific intent to monopolize a market in which it does not participate").  Therefore, as Operator Defendants are not suppliers of TPA Services, they cannot monopolize or attempt to monopolize the market pled by the Plaintiffs and their conduct is not an actionable antitrust injury.[33]  Accordingly, Plaintiffs' monopolization and attempted monpolization claims against Operator Defendants must be dismissed for lack of standing.

*B.  Relevant Market*

As a threshold matter, Plaintiffs "must define a relevant market within which the

---

[33]  This restriction is not absolute, as courts have applied § 2 protections in cases of monopsony.  *Campfield*, 532 F.3d at 1118.  As the 10th Circuit recognized in *Campfield*, "A monopsony is different from the usual form of monopolistic control in which suppliers utilize market power to restrict output and thereby raise prices. In a monopsony, the buyers have market power to decrease market demand for a product and thereby lower prices."  *Id.* at 1118 (emphasis added).  In this case, however, Plaintiffs do not allege that the Operator Defendants have exercised their market power to reduce demand and lower prices.  To the contrary, Plaintiffs allege that (1) Operator Defendants are not buyers and (2) as a result of Operator Defendants' conduct, prices have actually increased.  As a result, Plaintiffs have alleged no grounds for finding Operator Defendants liable under § 2 for monopsonistic behavior.

defendants allegedly engaged in anticompetitive behavior." *Campfield*, 532 F.3d at 1117;

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965) ("Without

a definition of the relevant market there is no way to measure a defendant's ability to lessen or

destroy competition"). "Failure to allege a legally sufficient market is cause for dismissal of the

claim." *Campfield*, 532 F.3d at 1118 (citing *TV Commcn's Network Inc.*, 964 F.2d at 1025-26)).

As discussed above in relation to Plaintiffs' § 1 claims, Plaintiffs have failed to allege the

relevant product market adequately.[34] This failure is fatal to its § 2 claims. Even if Plaintiffs

adequately alleged a relevant product market, however, their claims against DISA and Operator

Defendants are still subject to dismissal.

### C. Monopolization

In order to plead monopolization adequately, the Plaintiffs must allege possession of

monopoly power in the relevant market and "the willful acquisition or maintenance of that power

as distinguished from growth or development as a consequence of a superior product, business

acumen, or historic accident." *Verizon Commcn's, Inc.*, 540 U.S. at 407; *see also Campfield,*

532 F.3d at 1117. Accordingly, "the possession of monopoly power will not be found unlawful

unless it is accompanied by an element of anticompetitive conduct." *Id.* at 407. Plaintiffs have

failed to adequately allege the existence of either monopoly power or anticompetitive conduct.

---

[34] *See supra* pp. 15-17. The analysis under § 1 is directly applicable to my analysis under § 2. *See Queen City Pizza Co.*, 124 F.3d at 442 n.18 ("Monopoly power under § 2 requires something greater than the market power under § 1 . . . this does not imply, however, that the analyses employed in the two types of cases to define relevant markets differ").

## 1. Monopoly Power

Monopoly power requires proof of both the power to control price and the power to exclude competition. *Full Draw Prods.*, 182 F.3d at 757 (citing *Reazin v. Blue Cross & Blue Shield of Kansas*, 899 F.2d 951, 967 (10th Cir. 1990)). In order for monopoly power to be meaningful for antitrust purposes, it must be durable. *Reazin*, 899 F.2d at 968. Durability is demonstrated by the existence of entry barriers, such as high capital costs or regulatory or legal requirements. *Id.* Plaintiffs simply allege that there exist substantial entry barriers, without providing any facts as to the nature of those barriers. Second Amended Complaint, Doc. 130, p. 31. Such a conclusory allegation is insufficient to withstand a motion to dismiss under Rule 12(b)(6).

## 2. Anticompetitive Conduct

Even if Plaintiffs had adequately pled a relevant market and the existence of monopoly power, their claim would still be subject to dismissal for failure to adequately allege anticompetitive conduct. Plaintiffs allege three types of anticompetitive conduct: exclusive dealing between DISA and Operator Defendants, tying of the DCC database to DISA's TPA service, and DISA's refusal to deal with Plaintiffs regarding the DCC Database.

## a. Exclusive Dealing and Tying

For the reasons discussed above, Plaintiffs' exclusive dealing and tying claims are insufficiently pled.[35]

---

[35] *See* discussion, *supra* at pp. 13-22.

*b.  Refusal to Deal*

Plaintiffs allege that DISA's refusal to populate the DCC Database with the drug-testing information collected by other TPAs constitutes an unlawful refusal to deal.  They argue that there is no discernible difference between the validity of the information collected by regulated TPAs and that the only reason for DISA's refusal to deal is its desire to gain a competitive advantage over its competitors.  Even accepting these claims as true, Plaintiffs fail to allege adequately that DISA's refusal to deal constitutes anticompetitive conduct within the meaning of the Sherman Act.

Generally, the Sherman Act "does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1194 (10th Cir. 2009) (quoting *Verizon Commc'ns*, 540 U.S. at 408).  As the Supreme Court has recognized, "[c]ompelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities." *Verizon Commc'ns, Inc.*, 540 U.S. at 407-08.  Accordingly, the Supreme Court has found a duty to deal in only one limited circumstance: where a monopolist terminates a pre-existing profitable relationship with a competitor without a lawful business purpose if that termination has an anticompetitive effect.  *See id.* at 409 (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985).  Plaintiffs do not allege any prior course of dealing between themselves and DISA.  DISA has, therefore, no duty to deal.

Though Plaintiffs fail to establish a duty to deal, they also claim that the DCC Database

is an "essential facility." "The [essential facilities] doctrine generally applies in situations in which the plaintiff is unable to compete in the relevant market . . . without access to a facility controlled by another." *Gregory*, 448 F.3d at 1204. "In order to establish antitrust liability based on the essential facilities doctrine, a plaintiff must show: '(1) control of the essential facility by a monopolist; (2) a competitor's inability to duplicate the facility; (3) denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility.'" *Id.* Here, Plaintiffs have failed to allege that they are unable to create their own version of the DCC Database. Accordingly, Plaintiffs fail to allege anticompetitive conduct in the form of denial of access to an "essential facility."

As Plaintiffs have failed to adequately allege a relevant product market, monopoly power, or anticompetitive conduct, their monopolization claim must be dismissed.

### D. Attempted Monopolization

To plead attempted monopolization adequately, Plaintiffs must allege a dangerous probability of success in monopolizing the relevant market, specific intent to monopolize, and conduct in furtherance of such attempt. *Full Draw Prods.*, 182 F.3d at 756. As discussed above, Plaintiffs have failed to allege a relevant market or any form of anticompetitive conduct. Further, Plaintiffs have failed to adequately allege a dangerous probability of success in monopolizing the market.

In order to demonstrate dangerous probability of success, Plaintiffs must plead facts sufficient to establish the durability of DISA's market power. *See United States v. Microsoft Corp.*, 253 F.3d 34, 82 (D.C. Cir. 2001) ("Because a firm cannot possess monopoly power in a market unless that market is also protected by significant barriers to entry . . . it follows that a

firm cannot threaten to achieve monopoly power in a market unless that market is, or will be, similarly protected"). Just as Plaintiffs failed to allege durability in relation to their claim of actual monopolization, they fail to do so in relation to their claim of attempted monopolization. In light of Plaintiffs' failure to adequately allege a relevant market, a dangerous probability of success, or anticompetitive conduct, their claim of attempted monopolization must be dismissed.

### E. Conspiracy to Monopolize

Even if Plaintiffs' Second Amended Complaint is liberally interpreted to include a claim that Operator Defendants conspired with DISA to monopolize in violation of § 2, such a claim must be dismissed for failure to state a claim. In order to establish a conspiracy to monopolize, a plaintiff must offer proof of, "(1) the existence of a combination or conspiracy to monopolize; (2) overt acts done in furtherance of the combination or conspiracy; (3) an effect upon an appreciable amount of interstate commerce; and (4) a specific intent to monopolize." *TV Commc'ns Network, Inc.*, 964 F.2d at 1026 (quoting *Olsen v. Progressive Music Supply, Inc.*, 703 F.2d 432, 438 (10th Cir. 1983)). As discussed above in relation to Plaintiffs' group boycott claim, the Second Amended Complaint fails to plead facts adequately which would support an inference of a conspiracy between DISA and Operator Defendants.[36] Even if Plaintiffs had pled the existence of a conspiracy, agreements that do not harm the competitive process do not amount to a conspiracy to monopolize. *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 139 (1998). As Plaintiffs have insufficiently pled that Defendants' conduct has harmed the competitive process under § 1, this is additional grounds for dismissing any potential conspiracy to monopolize claim. *See Gregory*, 448 F.3d at 1206.

---

[36] *See* discussion *supra*, pp. 24-26.

*Fourth Claim for Relief:  Section 3 of the Clayton Act*

Plaintiffs allege that both DISA and Operator Defendants have engaged in unlawful tying

and exclusive dealing.  Section 3 of the Clayton Act, however, only applies to "goods, wares,

merchandise, machinery, supplies, or other commodities."  15 U.S.C. § 14.  As Plaintiffs claims

relate to the provision of TPA <u>Services</u>, § 3 of the Clayton Act provides no remedy.  *See Sports*

*Racing Servs.*, 131 F.3d at 880 n.8.

*Fifth, Sixth, and Seventh Claims for Relief:  Violations of State Antitrust Statutes*

Plaintiffs allege monopolization, attempted monopolization, and restraint of trade in

violation of state antitrust laws, including those of California, Colorado, Louisiana, Oklahoma,

and Texas.  As a threshold matter, these claims are predicated on the same alleged conduct as

Plaintiffs' federal antitrust claims, and the states apply their antitrust laws in harmony with

federal antitrust law.[37]  Thus, for the reasons stated above in relation to Plaintiffs' Sherman Act

claims, their state law claims are appropriately dismissed.

---

[37] *See Chicago Title Ins. Co. v. Great W. Fin. Corp.*, 444 P.2d 481, 487 (Cal. 1968)
("The California law of antitrust, commonly known as the Cartwright Act, is patterned upon the
federal Sherman Act and both have their roots in the common law; hence federal cases
interpreting the Sherman Act are applicable with respect to the Cartwright Act."); Colo. Rev.
Stat., Art. 4, § 6-4-105; *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*,
311 F. Supp. 2d 1048, 1074 (D. Colo. 2004) ("Because Colorado antitrust law mirrors federal
antitrust law under the Sherman Act, the court will solely examine plaintiffs' claims under
federal law as dispositive of plaintiffs' state law claims."); *Tuban Petroleum, L.L.C. v. SIARC,
Inc.*, 11 So. 3d 519, 523 (La. App. 2009) ("The Louisiana Supreme Court has . . . looked to the
federal jurisprudence for guidance because the federal and state antitrust statutes are virtually
identical."); Oklahoma Antitrust Reform Act, 79 OSA § 212; *Inergy Propane, LLC v. Lundy*,
No. 10-3914, 2008 WL 5726461, at *7 n.3 (Okla. Civ. App. Aug 13, 2008); Tex. Bus. & Com.
Code; § 15.04; *In re Memorial Hermann Healthcare Sys.*, 274 S.W.3d 195, 200 (Tex. App.
2008) ("The Act instructs courts to construe its provisions 'in harmony with federal judicial
interpretations of comparable federal antitrust statutes' to the extent consistent with the Act's
purpose.").

*Eighth Claim for Relief: Unfair Competition*

Plaintiffs claim that Defendants have engaged in unlawful business practices in violation of California law. As Plaintiffs have failed to adequately allege that Defendants' conduct is unlawful under either federal or state antitrust statutes, its claim of unfair competition must be dismissed. *See, e.g.*, *Live Universe, Inc. v. MySpace, Inc.*, No. 07-56604, 2008 WL 5341843, at *3 (9th Cir. Dec. 22, 2008) ("Where . . . the same conduct is alleged to support both a plaintiff's federal antitrust claims and state-law unfair competition claim, a finding that the conduct is not an antitrust violation precludes a finding of unfair competition"). Furthermore, Plaintiffs' failure to allege specifically that the complained of conduct occurred in California provides additional basis for dismissal. *See, e.g.*, *Norwest Mortgage, Inc. v. Superior Court*, 72 Cal. App. 4th 214, 222, 227 (Cal. App. 1999) (explaining that the California UCL "contains no express declaration that it was designed or intended to regulate claims of nonresidents arising from conduct occurring entirely outside of California").

*Ninth and Tenth Claims for Relief:*

*Tortious Interference with Contractual and Prospective Business Relations*

Plaintiffs allege that Defendants, though their violations of the Sherman Act and state antitrust statutes, have tortiously interfered with their existing contractual relations and prospective business relations. In order to establish tortious interference with contractual relations, Plaintiffs must show: "(1) [they] had a contract with a third party; (2) defendants knew of the contract's existence; (3) defendants intentionally induced the third party to breach the existing contract; (4) defendants acted improperly; and (5) defendants' actions caused plaintiff[s] to incur damages." *Campfield*, 532 F.3d at 1122 (quoting *Steinbach v. Dillon Cos., Inc.*, 253

F.3d 538, 540 (10th Cir.2001)). "Tortious interference with prospective business relations requires identical elements, with the exception that an existing contract need not be alleged. Rather, [Plaintiffs] must show that there was a reasonable likelihood that a contract would have resulted but for the wrongful interference." *Id.* (quoting *Klein v. Grynberg*, 44 F.3d 1497, 1506 (10th Cir. 1995)).

As discussed above, Plaintiffs have failed to allege adequately that Defendants have violated the Sherman Act or any state antitrust statute. As Plaintiffs assert no other grounds that Defendants acted improperly, they have failed to allege adequately claims for tortious interference with either existing contractual relations or prospective business relations and these claims must be dismissed. Additionally, Plaintiffs fail to plead adequately either the existence of contracts between themselves and the Service Companies or that any contract was breached. This pleading deficiency provides further grounds for dismissing Plaintiffs' claim that Defendants tortiously interfered with their contractual relations. Finally, Plaintiffs' failure to allege specifically the business lost as a result of Defendants' conduct requires dismissal of their claim that Defendants tortiously interfered with their prospective business relations.

## CONCLUSION

Though Plaintiffs' claim may have been sufficient under the more permissive "no set of facts" standard which long constituted the pleading standard in federal courts, the Supreme Court has explicitly directed lower courts to dismiss claims which fail, on their face, to state a plausible claim for relief. As detailed above, Plaintiffs have failed to set forth sufficient facts to support any of their ten asserted claims for relief. As I find that Plaintiffs' Second Amended Complaint fails to state a plausible claim for relief, Defendants' Motions to Dismiss, Docs. 104 and 133, are

GRANTED. Plaintiffs' Second Amended Class Action Complaint and Jury Demand, Doc. 130, is dismissed without prejudice.

Dated:  April 7, 2010             **/s/John L. Kane**_____
                                   SENIOR U.S. DISTRICT JUDGE